I'm sorry, I didn't see you walking up here, and I thought we were short a lawyer. Welcome to the Ninth Circuit. Thank you. And we're ready to hear your argument whenever you're ready to begin. Thank you. Good morning. Jean Reese, USC Immigration Clinic Pro Bono Counsel for Ms. Maria Luna. Here, the court needs to remand the case to the BIA because the BIA failed to aggregate the different theories of torture to Ms. Luna, and also because substantial evidence compels a contrary conclusion to the board's determination that Ms. Luna wasn't likely to be tortured or that she wasn't likely to relapse. Sorry, I thought you were going to ask a question. Oh, I'm sorry, but I was thinking of asking one. So I will go ahead and ask, what about the last page of the board's order where they say the immigration judge considered the entire record and the aggregate risk of torture? Like, why doesn't that answer the point you started with? Well, I think because the board says that it was done doesn't preclude this court from making sure it actually was done. And if you look at the board's decision, the board agrees this is a chain of assumptions, a single chain on page four of the administrative record. We agree with the immigration judge this is a series of assumptions. Here, the judge permissibly found that Ms. Luna didn't establish all the causal links in this single chain of events. The board also says there's no probability of relapse, no probability of her past drug use becoming known, or no probability that she would be placed on this drug list or one of the drug lists. And so that is very similar to Velasquez-Samayoa, showing that there's this or, and that there's a requirement of clear probability for each one individually, which is instead of looking at them in the aggregate, I think if you look at the IJ's decision, it's even more clear that there was a failure to aggregate because the board says this is very much like JFF. Sorry, the board. The IJ says this is very much like JFF. And then predicates the kind of chain of events on her relapsing or not relapsing and says that she's not likely to relapse because she's been sober in the U.S. and has job skills. Right. But so, I mean, so in Velasquez-Samayoa, you had a pretty explicit statement from the agency that what was in fact alternative theories of what might happen were, you know, instead they erroneously viewed as all of these things have to happen, right?  And we said that's wrong. But, you know, we also have cases, you know, like Hernandez from last year where we don't lightly presume that the board has sort of disregarded what is a fairly basic principle of probability and logic. And here, you know, when we look at the order from the board, I mean, they have the discussion of, you know, is she going to relapse? And then, you know, they say, you know, next we discern no clear error in the immigration judge's finding that the respondent would not be targeted if she does not relapse. So, I mean, reading it all in context, it does seem like they recognize that there's, you know, the path involving relapse and the path involving non-relapse, which are obviously distinct theories of torture. So, why isn't that enough to suggest that they understood those two separate theories? Well, I think there were more than just her relapse or her not relapsing. And the board here, it's different than Hernandez, because in Hernandez, the IJ indicated that, look, any or all of these things are a possibility. Here, the IJ is saying, this is a supposition. This is a series of a chain of events. And the board doesn't say, well, there's a possibility that all of these things happen. The board say, her relapse is a real possibility, but it's not a clear probability. And then elsewhere, the board says, and her being in danger even if she doesn't relapse, there's some likelihood, but it's not a clear probability. So, I think that that is illustrative of this analysis that's not aggregating those two things. There's other theories as well regarding her being in the slums that are targeted by extrajudicial killing groups because of her lack of family support, her lack of speaking Tagalog, her skills being for construction, low menial. I mean, she has skills for drug counseling, which is not needed in the Philippines because there are no recovery programs. So, those are other ways where she can come to the attention of authorities and have this likelihood of torture. Counsel, the BIA is looking to the findings by the IJ, and the IJ made several findings about what the expert did or did not say that I am struggling with. The IJ said that the expert opined that if Luna is not using drugs, she should not be in danger. I don't think the expert said that at all. I don't either, and we argue in our open brief. That's just kind of a misstatement of the record. It is a misstatement. That's the problem. The IJ said that the expert testified that her deportee status will not be relevant as she enters society. Did the expert say that? No. The expert was asked, do you know how many deportees are killed? You know, deportees from the U.S. are killed in the Philippines. And he says, no, I don't have that number because their deportee status is not being tracked. Okay. The IJ also said that the expert said as long as she does not use drugs, she most likely is not going to get on the list. And that's not accurate. What do we do about it? I think that's right. I'm going to spare you because I have five of them. I just don't think the expert said that. I've really been over it. And so I struggle with this case but for a different reason. I think Judge Miller has a really good point, and I agree. The BIA says that the IJ, it's assuming that the IJ considered all the evidence. It says the IJ meaningfully considered all the evidence at page five of its decision and permissibly found inadequate evidence that, for example, she would be unable to find a job. But that's not what the IJ found. What the IJ found, in fact, is her skills will be of immense benefit to the government in the Philippines and will hardly have any problem finding a job or employment whether she speaks Tagalog or not. There seems to be a real disconnect between what the evidence was in the record, I rarely see cases like this, and the findings by the IJ. I don't see that they're supported. That's correct, Your Honor. There is a disconnect because there is a misstatement of the testimony, and then that is what the IJ relies on to find that she's not more likely not to be tortured. Right, but she's the one that's got the burden of proof here, not the government, right? She's found credible, and she's got her expert, and her expert's found credible, although the IJ clearly thought there was some question about whether the IJ accepted the expert as having a full knowledge of the situation in the Philippines. But it is her burden of proof, right? And she meets that burden. Well, how does she meet the burden? She meets the burden because her expert provides uncontested testimony that she is, you know, the situation, and the expert focuses research on the Philippine culture. So the expert says, look, she is likely to use drugs again, she's likely to live in these neighborhoods, that people get on the watch list even if they don't use drugs because they're an outsider, because they're investigated, because there's suspicion. Can I stop you there? But I think that's all right. I'm just worried about your time. We've been over this expert's report. Between us, I can't imagine how many times we've read it. It says all of that. But I don't think you're really arguing that the IJ is required to accept the expert or believe the expert's opinion just because it's uncontested by the government. Do you? That's not your position. I'm not arguing, no. Okay, it's still her burden. Yes. And if the IJ didn't find that expert opinion persuasive. But the IJ isn't saying I don't find the expert opinion persuasive. The IJ is saying. Is making a bunch of findings based upon what the expert didn't say. That's my problem. That's different, though, than what your argument is. You see the difference that I'm trying to get at. So, I mean, I guess if this is a substantial evidence test, the substantial evidence is not what the board found in order to deny Kat. And so that is why this court can remand. I think I interrupted you, Judge Feist. No, no, no, no. It seems to me it's a substantial evidence issue or question, correct? Right. And she's got the burden. As the petitioner, there's no question she's got the burden. Well, okay. Well, it's that the agency's decision is not supported by substantial evidence. That's correct. But isn't that, but you were focusing earlier on the BIA's decision, and the BIA's making a decision that the IJ carefully considered this evidence and reached these underlying findings. That's why I'm trying to go to the foundation because I can't see that these, and like I said, there's five of them that we've just reviewed, findings that the IJ made based upon what the expert did or did not say, and I don't see the support. Right. And so the board, there is not substantial evidence that the IJ did these things, and these findings are wrong. And this court can find that there's substantial evidence that compels the conclusion that the board's not correct. And so that is what we're asking the court to do. I understand that. I'm just trying to reverse engineer how we got here. But I think I've interrupted. No? No. Would you like to reserve the rest of your time? I will. Thank you. Okay. Let me just make sure. Counsel, can you see the screen? Can you see opposing counsel over there? Yeah. That screen. Okay. Great. Go right ahead. May it please the court, Matthew George for the Attorney General. Judge Kristen, if you have specific factual issues that you'd like to address, I think we should jump right into that. I don't want to belabor points that the court might already be familiar with. I really appreciate that. I really appreciate that. So the IJ says at 72, the quote, the expert, I think this is a quote, the expert opined if she's not using judge, she should not be in danger.  That the expert said as long as she does not use drugs, she's most likely not going to get on the list. I don't think the expert said that. Maybe not that explicitly, but that's an inference that the immigration judge is making from what the expert testified to. I think the overall testimony that the expert provided was that it's drug users that the government is concerned with, and so known drug users are the main people that get on the list. And so what kind of follows from that is if you're not a drug user, that the likelihood of getting on the list goes down. Now that wasn't the end of the agency's or the immigration judge's inquiry. The immigration judge and board went on to look at the other factors that petitioner brought up in this case. And so it wasn't an all or nothing type of inquiry about drug use. And that was it. But that was sort of the extrapolation that the immigration judge made from the general statement. Is it a fair extrapolation, counsel? Because the expert testified that you don't have to be a current drug user or dealer to be on the list, right? If she was known as a prior drug dealer, that she's in danger. I think he said that pretty clearly. Sorry, go ahead. And that's also what the immigration judge and the board looked at. They didn't isolate the analysis to the relapse issue. They also looked at all those other factors. And they kind of played back and forth in terms of looking at the relapse issue. The immigration judge looked at would she be able to find a job and a few of those other factors. And then looked at broader if she didn't relapse, looked at all those factors of living in a neighborhood, not being able to get a job, being a deportee, and things like that. What evidence in the record supported the finding that, quotes, her skills will be of immense benefit to the government in the Philippines and or respondent will hardly have any problem finding a job or employment whether she speaks Tagalog or not? What supported those findings? Well, that comes from the parole board findings where it listed, I think it was the janitorial, landscaping, auto mechanic, computer literacy, building maintenance. There's support in the record about her having the landscaping skills and the drug counseling skills. And I appreciate the support for the training. But there's a different finding here. Her skills will be of immense benefit to the government in the Philippines and she will hardly have any problem finding a job whether she speaks the language or not. And that's an inference or a conclusion that's drawn from the evidence of her having these job skills and then being able to find a job having job skills. I mean, that's just illogical. Wait a minute. What do we know about the market for these job skills in the Philippines? Do they not have janitorial, landscaping, auto mechanics, computer literacy, building maintenance? I have no idea. They're not Philippine experts. That's our problem. I think the evidence is a mixed bag. She was able to convince the parole board that she should be released from prison given a very serious conviction. I'll grant you all of that. So I find this case very unusual in that way. But there are findings here by the IG that strike me as seriously unsupported. And I don't know if that's going to really change the outcome if somebody went back and said, is there enough? Because all of this has to do with a crystal ball. It's a guess about how she's going to do. Will she be able to stay sober? Will she relapse? And surely her ability to get employment would factor into that. I don't know if the BIA would reach the same decision. Well, the same decision based on what? The overall finding is that she has these job skills and that she will more likely than not or whatever, that she'll be able to get a job. She won't be unemployed. So it's really where the inquiry is looking. Well, I don't think there's any question that we're looking at, they were looking at, whether she's likely to relapse. Because I didn't see any pushback about the notion that this would be a very dangerous regime and potentially deadly regime for her if she were to relapse and wind up on that list. I don't think the government's contesting that. I think the government's position that I understood, and please correct me if I'm wrong, is that this is too speculative for us to know. She didn't prove her case that she's going to wind up on that list. Is that a fair summary? That's the overall speculative, and also the evidence that she's presented doesn't present a particularized risk of torture. And also the overall inquiry is just about likelihood of torture. It's not parsing out particular findings or anything like that. The agency is looking overall, has she met her burden of showing a likelihood of torture? And so the board didn't make a finding that she will get a job, right? That's correct. So, I mean, it said, you know, there is evidence that she might relapse, but there's also evidence that would lead to the conclusion that she might not, and that includes that she has, you know, these skills and has made progress since 2009, and some of the other factors they pointed to. Is that a fair reading of what they said, that, you know, you've got these things on both sides, but here's some of the evidence to suggest that she might not, and on balance we think that it's not more likely than not that she will. Is that fair? Yes, John, that's exactly what the board said. The board said a reasonable fact finder could have gone in her favor because of the evidence is so, you know, there's evidence on both sides, as your honors just pointed out, and the board recognized that looking at, in the relapse context of the scientific realities of addiction and relapse and the country conditions and all those different factors, but the immigration judge had looked at those factors and said no likelihood of relapse or failed to meet the burden of showing likelihood of relapse, and so the board doesn't get to step in any more than the court gets to step in and reweigh those factors and reach a different conclusion. In the absence of compelling evidence, which that's not what we have here, we have evidence on both sides. Counsel, counsel, help me out with this one. The BIA said there's no clear error in the IJ's finding that, quote, according to the expert witness, respondent is unlikely to be in danger if she does not reoffend. That's really coming from the general statement that the expert made about the people that the government are interested in are drug users and drug traffickers. The BIA is relying on the IJ's finding that according to the expert witness, the expert witness supported that she's not likely to be in danger if she does not reoffend. Right. That's one portion of the decision that the board reviewed. The board also reviewed that she's not likely to, and considering all those other factors to show likelihood of torture, the board went on and said sort of looking at it all together, it doesn't make a meal likelihood. And then also none of this is particular to her. It doesn't show a particularized likelihood of torture. And so the board made essentially four different determinations there looking at the evidence that is in the record. So any one of those could really support the board's overall finding. And the petitioner needs to demonstrate compelling evidence, at minimum, that she has a particularized risk of torture. Could I take you to the argument that counsel first advanced when she started off her argument, which was that the board's decision, even though at the very end, as Judge Miller pointed out, he uses the term in the aggregate. But if you go to the board's decision, as counsel pointed out, the board makes it pretty clear. It says, we agree with the immigration judge that the respondent's fear of torture is based on a series of assumptions. See, matter of JFF. And then at the end of that paragraph, the board writes, a respondent cannot meet her burden if one link in a chain of hypothetical events cannot be shown to be more likely than not to occur. Now, that statement doesn't seem to – so one way I was reading the aggregate statement was they were just saying that when you go down the assumptions, there wasn't – looking at those assumptions in the aggregate, there wasn't enough. But we made a recent decision in – was it Velazquez, I think it is? We made it clear when there's two theories, you've got to look at them – you have to aggregate the theories together. And is that what – did the board do that here? The board did both. The board did look at it as a series, and that's how we argued it in the brief. But the board also at the end looked at it all together, both in terms of – I read the immigration judge's decision at the end as sort of looking at everything together on the last page or the last two pages of the immigration judge's decision. And that's what the board is referring to when it makes its statement about aggregation. And it's also responding to or resolving that issue that petitioner raised in her brief to the board about aggregation. So it does both. And then it also at the end of its decision says none of this is particular to her, which is a separate requirement that she has to show a particularized risk. So the board initially does make that JFF type of linear analysis and says, look, she hasn't met at least two of those steps. And then it says, looking at all this in the aggregate as the immigration does, it is in a very generic way in the immigration judge's decision. But the board is saying, looking at this all together, it doesn't meet the likelihood. The board didn't have the benefit of our decision in Velazquez, did it? No, at that time I believe the decision predated Velazquez. But I'd also like to point out. Do you think Velazquez adds anything to this area of the law? Velazquez really reaffirms Cole from I believe it was 2011. And as I highlighted in the 28-J letter, the response that I filed, Velazquez, Cole, Hernandez, Iruhita, all of these cases emphasize that it's sources of torture that need to be aggregated. It's not the reasons really for the torture. I know Velazquez uses the term theories, but then it applies those theories to different sources of torture. Can you help me with that? I'm not sure that I understood that from the. What's your best take on that? Theories, sources. I think the word source is the best one because that's the word that Cole used as well. So where there's different entities in. You mean different torturers, different torturers. Right. Like in Cole it was police, death squads, and gangs. In Velazquez it was Salvadoran officials and rival gang members. In Iruhita it was a gang, MS-13, and then a private individual. So unlike all. In this case then you think we don't consider that she could wind up, the risk, whatever it is, that she'd wind up on the list if she relapses versus the risk that she'd wind up on the list because of her prior history. Right. Those are not different sources. That's just a way to get the attention of the source, which here is the government, or maybe it's agents that have sort of been deputized in terms of the private individuals and all that, but they're really acting on behalf of the government. So in this case there's only one source. So in terms of using the word theory, there's only one theory, and that's ending up on a drug list. Really what Petitioner has presented is two different ways of getting on there, and the evidence sort of presented them in that way. That's why the immigration judge analyzed them that way. That's why the board analyzed them in that way because that's also how she presented it to the board in her board brief. She presented it as these two different, I think even said that my likelihood of relapse is separate from the likelihood of harm from all these other sources together. So that's why the board analyzed it in that way and then wrapped it up at the end and said, look, looking at all this in the aggregate, if that's how we're supposed to do this, then she hasn't met her burden looking at it that way. It's interesting. Just before they make that statement, they again cite matter of JFF. Right. They did both here. And that's where a case like Irohita comes in of saying looking overall, and I guess Hernandez as well, of looking overall at what the board did. It was considering these things. It was considering it both in a linear fashion and then it considered it altogether. And the court can discern that from what the board said. And that's all that the board needs to do. So because she hasn't presented the compelling evidence to reverse the board's decision or to compel a different finding, and particularly she hasn't particularized evidence of torture, the court should deny her petition. Anything further? I think that's it. Thank you, counsel. Thank you. Just a quick kind of comment on the sources versus reasons question. Velasquez-Semillo, clearly, says that the court has to aggregate sources and reasons. Hernandez, in citing Velasquez-Semillo, says sources and reasons. So we're not just looking at the torturers. We're looking at the reasons for the torture. So what do you think they didn't do here? Can you just give me a crisp response about what you think the error was? The board did not aggregate all the different ways that she'd be tortured. So fill that in for me. So it didn't aggregate her likelihood of relapse with the likelihood of being reported by her family, with the likelihood of being investigated by authorities, with the likelihood of her past becoming known due to community rumor, with the likelihood of her living in a low-income area targeted by extrajudicial killings. It didn't aggregate all of those in the likelihood, which meets that over 51% burden. And to get to your honors question about kind of the board, you know, it's her burden. The IJ makes clear error with the expert testimony. If the expert testimony is read and there's no evidence, the IJ doesn't say there's contradictory evidence, the expert testimony, the IJ gets it wrong. And the board says that's not an error. The board doesn't say, but even if it is an error, it's not harmless error because she didn't meet her burden here. It's all speculative, and it doesn't meet the burden. The board just says, I agree with the judge's findings. And so the board's wrong because the judge's findings are wrong. And also, if this case were remanded and all of these things that Dr. Raphael said regarding her likelihood of being tortured even if she doesn't relapse, that would establish her burden because there isn't anything to contradict that evidence. Let me ask you a couple of questions, if I may. What do you think Alaska has added to our law in this area? Well, I think that in these kinds of CAT cases, the board is always citing to JFF as these kind of series of assumptions. And I think CAT, by nature, is assessing hypothetical and this hypothetical risk. Alaska shows that, kind of just expounds upon what it means to consider all relevant factors, that there's this aggregation. And so by requiring Ms. Luna and Mr. Velazquez to say, there's a clear probability of getting tortured in this one way, and there's a clear probability of getting tortured in this other way, that that is increasing the burden. So I think Velazquez-Samuel adds that you don't have to show that there's a clear probability in this one way and a clear probability in this other way. You look at it in the aggregate and see if it gets you to that 51%. And I think that historically, and this was the situation the board was in before the benefit of Velazquez-Samuel, is invoking JFF to deny, but actually just increasing the burden on the CAT applicant to have all these theories more likely than not, and then kind of reducing them to this chain of suppositions. So what is the relief that you want? What are you asking for? Well, I'm asking that the court find that substantial evidence compels a contrary conclusion that she wouldn't be at risk if she didn't relapse, and to find that substantial evidence compels the conclusion that there is a likelihood of relapse, and remand to the board with those findings to consider in the aggregate. Go ahead, Judge Miller. I'm just, what's your answer to the government counsel's point that, I mean, there's a lot of evidence in this record sort of pointing both directions. And this is not on the aggregation point. This is just the general substantial evidence point. And the board acknowledged that, and, you know, for us to reverse that, we would have to be able to say, right, that any reasonable fact finder would be compelled by that record. And I guess I'm just asking you to restate, like, how, given that there's a bunch of stuff on both sides that they acknowledged, like, how can we say that the only way you could resolve it is the way you're saying? The board's decision rests on the immigration judge's error. And that error can't go both ways. That error is saying something that is not in the record. But let me push back on that a little bit because I've given you, I think, five examples where I'm struggling with some of the IJ's findings to see that they're supported. But that doesn't mean everything's unsupported. And what if I decide, following up on Judge Miller's question, that I can't tell what the mix would be if we said these five things aren't supported? Is it our job to go re-weigh this? No, and I'm not asking the court to re-weigh. But the board says in supporting the IJ, and the IJ says she's not likely to relapse, and she's got these skills, and that's the basis of the denial. So I don't think you can read this record and say that that could go either way, her having these skills or not having these skills as far as getting a job or not getting a job. Well, let me put it this way. Let me put it this way. I don't think there's support in the record for this finding about the likelihood of her ability to find a job. I do not see support in the record for that, or at least just that I'm one of three. And that seems to me to be very logically tied to her ability to stay clean and to not relapse, right? Correct. But it's only one of the supports for that conclusion about whether she will or will not relapse. That's the prediction of whether she will or will not relapse and wind up on the list. So it doesn't seem to me that if we knock that out and say, you know, that's not supported, that we would be in a position to draw the conclusion you want us to draw, as opposed to remanding and saying, take another look at this record. Well, I will take just a remand to take another look at the record. But I do think that— What's your best argument, though, in response to Judge Miller's question that we should do more? Because the evidence—there is no evidence to support the IJ's findings. There is evidence to support the opposite of the IJ's findings, that there's not— Well, there is some evidence. Let me just do this easily. There was enough evidence for her to convince the parole board that she'd be okay to get out of prison. And she was convincing the parole board she wasn't likely to be a danger, not that she wasn't likely to use drugs. And the parole board said she has to be in a treatment program and she has to test. So the board wasn't accepting her—you know, no one's rooting for her to relapse, but wasn't accepting her desire not to relapse as a reason to release her on parole. The inquiry was whether she poses a dangerousness, and then the board created these safeguards. You would agree, wouldn't you, that if the board did not do a proper aggregation, as we laid out in Velazquez, that that would be a legal error? Correct. Thank you. Thank you. We have one big aggregation fan on the panel here in a t-shirt. I want to thank both of you for your careful preparation. This case is a tricky case, I think, and we appreciate your argument very, very much. Thank you. We'll take it under advisement.
judges: PAEZ, CHRISTEN, MILLER